## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS BORTHWICK** | : |
| | : |
| **Plaintiff,** | : |
| | : CIVIL ACTION NO. _____ |
| **V.** | : |
| | : |
| **RIVERSIDE SCHOOL DISTRICT,** | : **JURY TRIAL DEMANDED** |
| | : |
| **Defendant.** | : **(ELECTRONICALLY FILED)** |

## COMPLAINT

Plaintiff Thomas Borthwick, by and through his undersigned counsel, hereby complains of the above-named Defendant Riverside School District as follows:

## I.    INTRODUCTION

1.    Due to the global pandemic caused by the COVID 19 virus where thousands of Americans were dying each day, the Centers for Disease Control and Prevention (the "CDC") and the Equal Employment Opportunity Commission (the "EEOC") guided employers to encourage telework for as many employees as possible to promote public health and safety and to minimize the risk to individual employees.

2.    Despite this strong and clear guidance from the CDC and EEOC, Defendant Riverside School District (the "District") has failed and/or refused to allow Plaintiff Thomas Borthwick ("Borthwick"), whose diabetes places him at an increased risk of harm from COVID 19, to continue teleworking, which

Borthwick, his colleagues and all other teachers have done successfully for the remainder of the 2019-2020 school year when schools were shut down by order of Governor Tom Wolf in March of 2020.

3.     The District's failure and/or refusal to provide Plaintiff with an accommodation to telework forced Plaintiff to take leave at reduced compensation under the Families First Coronavirus Response Act ("FFCRA"), and also forced Plaintiff to use his accumulated sick leave and/or personal days.

4.      To make matters worse, the District engaged in a series of retaliatory actions against Plaintiff in response to his accommodation request and subsequent leave.

5.     By refusing the requested accommodation and engaging in the aforesaid retaliation, the District engaged in a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA"), as well as the Pennsylvania Human Relations Act, 43 P.S. §§ 951 − 963 (the "PHRA").

## II.   <u>PARTIES</u>

6.     Plaintiff Borthwick is a competent adult individual who resides at 1419 Schlager Street, Scranton, Pennsylvania 18504.

7.     Defendant District is an educational institution duly organized, established and existing under the laws of the Commonwealth of Pennsylvania,

which maintains a place of business at 300 Davis Street, Taylor, Pennsylvania 18517.

8.      At all times relevant hereto, Defendant acted by and/or through its agents, servants and/or employees who acted all times in the course and scope of their employment with and for the District.

## III.    JURISDICTION AND VENUE

9.      This Court possesses jurisdiction over the claims set forth herein pursuant to 28 U.S.C. §§ 1331 & 1367, as well as 42 U.S.C. § 12101 et seq.

10.     All conditions precedent to jurisdiction under the ADA have been satisfied.   Timely complaints of discrimination were filed with the EEOC and Pennsylvania Human Relations Commission ("PHRC").   A right to sue letter was issued on or about March 1, 2021, and this action is being filed within 90 days of Plaintiff's receipt of said right to sue letter.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events and/or omissions giving rise to the claims set forth herein occurred in this district.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12.     At all times relevant hereto, Plaintiff served as an employee of the District, who suffers from Type 1 Diabetes, a disability under the ADA.

13.     Diabetes is a medical condition that substantially impairs or limits one's major life activities.

14.     Based on CDC guidelines, individuals with diabetes are more likely to experience severe or serious symptoms and complications when exposed and/or infected with COVID-19.

15.     Plaintiff was hired by the District as an English Teacher on or about September 1, 2007, and continues to serve in that capacity teaching 11th and 12th grade classes at Riverside High School.

16.     Plaintiff has at all times diligently and faithfully satisfied all of his teaching duties since he was hired by the District.

17.     Plaintiff was not diagnosed with diabetes until after he commenced his employment with the District.

18.     Following his diagnosis, Plaintiff notified the school nurse and others of his diabetic condition, and the District was at all times aware that Plaintiff suffered from Diabetes.

19.     In fact, the school nurse has, on multiple occasions, rendered aid to Plaintiff during episodes caused by his diabetes, such as low blood sugar.

20.     Due to this condition, Plaintiff utilizes a Dexcom sensor that requires the use of his phone for the receipt of signals that monitor his blood sugar and alerts him to potentially dangerous and life-threatening changes in said levels.

21.    District officials were at all times aware of Plaintiff's diabetes diagnosis, its related symptoms and the use of the aforesaid Dexcom sensor to monitor his condition.

22.    On or about March 13, 2020, Governor Tom Wolf ordered the temporary closure of all K-12 Pennsylvania schools due to the pandemic.

23.    That temporary closure became permanent on or about April 9, 2020, when Governor Wolf ordered the closure of all schools for the remainder of the 2019-2020 school year.

24.    In doing so, Governor Wolf stated: "We must continue our efforts to mitigate the spread of this virus during this national crisis", and this decision "is in the best interest of our students, school employees and families".

25.    And the Secretary of Education, Pedro A. Rivera, further commented as follows: "By taking these actions, the department is providing flexibility in the near term, while signaling that core functions of public education can and will continue".

26.    Thus, although schools were closed, teaching and learning continued online through various virtual platforms throughout Pennsylvania, including in the Riverside School District.

27.    Accordingly, Plaintiff and his fellow District teachers at all times performed their core and essential teaching duties and responsibilities, as well as

other tasks, in a competent and satisfactory manner through telework for the remainder of the 2019-2020 school year.

28.     Plaintiff received no complaints related to his telework or job performance.

29.     Throughout the Summer of 2020, the pandemic continued to surge, causing the state to issue a Level of Community Transmission Table to aid school districts in planning for a return to instruction.

30.     This Level of Community Transmission Table identified thresholds of low, moderate or substantial community spread of the virus, together with corresponding instructional models recommended by the CDC and Pennsylvania Departments of Health and Education.

31.     The District at all times remained in the "substantial" category for the level of community transmission, and Plaintiff became increasingly concerned that COVID-19 could threaten his life after learning of the alarming rate of spread and the severity of the virus and its documented presence in the region.

32.     Thus, on or about August 6, 2020, Plaintiff had a telephone discussion with the Superintendent of Schools, Paul Brennan ("Brennan"), at which time he relayed his health and safety concerns related to a potential return to in-person instruction, particularly the increased risk of contracting the virus related to his underlying diabetic condition.

33.    These health and safety concerns prompted Plaintiff to request continued telework as an accommodation on a temporary basis until the government restrictions were lifted or it was otherwise deemed safe to return to the classroom.

34.    Indeed, Mr. Brennan already knew that Plaintiff could perform the essential functions of his job from home because Plaintiff had successfully done so for months without undue hardship on the District.

35.    Plaintiff would continue to perform his teaching duties using the same virtual platform, and would continue to participate in Google Meets and/or Zoom meetings and/or phone calls and exchange emails and texts from colleagues, parents and students.

36.    However, instead of addressing Plaintiff's individual situation, Mr. Brennan indicated that he could not accommodate Plaintiff's request for continued telework because if he did it for one, he would have to do it for all.

37.    Mr. Brennan made this same statement to other teachers who made similar requests based on their respective disabilities that placed them at an increased risk of exposure to the virus.

38.    Mr. Brennan's statements were not surprising given previous comments he made earlier in the Spring that teachers working from home during the pandemic were lazy and were doing nothing.

39.   Mr. Brennan was requiring Plaintiff to physically return to the building despite the fact that Plaintiff was at all times able to perform the essential functions of his job remotely.

40.   Having met with resistance from Mr. Brennan, Plaintiff then inquired about addressing his concerns directly with District Board members, *via* email.

41.   Mr. Brennan informed Plaintiff that he could not do so because District Board members did not have publicly available email addresses, and that he would have to submit a Right-to-Know Law request for such information, which Plaintiff did on or about August 8, 2020.

42.   In lieu of email, Plaintiff further inquired if it would be possible to address the School Board remotely at the upcoming August 10, 2020 School Board meeting.

43.   Mr. Brennan did not respond to Plaintiff's inquiry, and the District's hostile work environment and pattern of retaliation against the Plaintiff began.

44.   Plaintiff did end up speaking at the August 10th School Board meeting, at which time he explained how he dealt with the anxiety from the unique nature of his situation, and how he maintained extreme isolation because of his high-risk status as a result of his diabetes.

45.     Certain Directors, however, paid little attention to Plaintiff while addressing the Board, and even heckled him from the dais as Plaintiff was leaving the meeting after the Board's vote.

46.     A few hours after the meeting, Plaintiff learned that the same School Board Director that heckled him after the Board meeting visited Plaintiff's Facebook page in an effort to try and find photos or other evidence of Plaintiff out in public without a mask in an effort to discredit his COVID 19 concerns.

47.     Although this Director focused on a certain Facebook photo, this backfired as said photo was taken in 2019 prior to the pandemic and posted by a relative in 2020.

48.     Also after the August 10th Board meeting, a School Board Director approached the President of Plaintiff's union, and indicated that he was displeased with the Right-to-Know Law request submitted by Plaintiff.

49.     Thus, not surprisingly, the District denied Plaintiff's Right-to-Know Law request for the aforesaid Board email addresses/contact information the very next day, August 11, 2020.

50.     In his continued efforts to receive an accommodation for continued telework under the ADA, Plaintiff provided to the District with a formal note from his physician on or about August 14, 2020.

51.    In that note dated August 12, 2020, Plaintiff's physician opined as follows:

> My patient Thomas Borthwick has been diagnosed with type 1 diabetes mellitus, a lifelong disease that substantially limits endocrine function.
>
> My patient is making a request for reasonable accommodation at work due to the COVID-19 pandemic. People with diabetes face a higher chance of experiencing serious complications from COVID-19. The CDC has advised people with diabetes to stay home to avoid exposure to the coronavirus. As such, it is imperative for the health and safety of Mr. Borthwick that he work from home.
>
> In general, people with diabetes are more likely to experience severe symptoms and complications when infected with a virus. For example, viral infections can increase inflammation, or internal swelling, in people with diabetes. This is also caused by above-target blood sugars, and both could contribute to more severe complications.
>
> Recent CDC data indicates that as many as 40% of the patients who have died from complications of COVID-10 had diabetes. As only 10% of the U.S. population lives with diabetes, this disproportionate figure is an indication of the grave risk that people with diabetes face, should they contact COVID-19.

52.    Given his high-risk status as outlined by his physician, the continuation of telework was the safest and most viable accommodation for the Plaintiff.

53.     As such, Plaintiff made a formal request to the District for continued telework accommodations in accordance with his physician's request, as well as newly established CDC and EEOC guidelines, which were specifically put in place and designed for employers such as the School District to navigate through the pandemic.

54.     Significantly, Plaintiff's request for such an accommodation was not a permanent one.

55.     It was simply one that would last until the government restrictions caused by the surging pandemic were lifted and it was safe to go back to in-school instruction on a full time basis.

56.     In short, Plaintiff did not make such an accommodation request under usual classroom circumstances.

57.     Rather, Plaintiff did so based on his physician's advice and clear CDC/EEOC guidelines at a time when thousands of Americans were dying each day, and where most school districts were either providing full virtual instruction or providing some sort of hybrid instruction.

58.     Indeed, these were not normal times.

59.     Accommodations which may be unreasonable during normal times may certainly be reasonable during a global pandemic, especially if they are on a

short term basis for teachers such as the Plaintiff who suffers from an increased risk of harm and severe complications from exposure to COVID-19.

60.    Again, Plaintiff suffers from diabetes -- an ADA covered disability and, more importantly, a condition the CDC makes clear that individuals are at an increased risk for severe or serious illness from the COVID-19 virus.

61.    More importantly, the Pandemic Preparedness in the Workplace and the Americans with Disabilities Act Publication issued by the EEOC make clear that choosing short term accommodations may be particularly helpful where -- as here -- the requested accommodation would provide protection that an employee may need because of a pre-existing disability that puts him or her at a greater risk during the pandemic.

62.    In fact, the EEOC has concluded that some accommodations may meet an employee's need on a temporary basis without causing an undue hardship on the employer.

63.    And this same EEOC publication indicates that telework be recommended as reasonable accommodation.

64.    On or about August 16, 2020, Mr. Brennan responded to Plaintiff's continuing request for such an accommodation by stating that he would like to discuss the request informally.

65.    Given the District's previous inactions and the urgency of the matter, Plaintiff instead elected to proceed by way of the formal Interactive Process as contemplated under the ADA.

66.    Given his ongoing concerns and anxiety related to the surging pandemic, Plaintiff requested that the interactive process meeting take place using a virtual platform or teleconference as was customarily used by the District during the pandemic.

67.    The District, however, continued with its hostile work environment and retaliatory actions against Plaintiff by repeatedly denying his request and forcing him to appear in person, indoors on District grounds.

68.    That indoor meeting took place on or about August 21, 2020.

69.    At this meeting, Plaintiff explained that he can continue to teach from home on a temporary basis just as he and every other teacher did successfully for the remainder of the 2019-2020 school year.

70.    Since students and not teachers were given the option of virtual or hybrid instruction, there would be a limited number of students who appeared for in-person instruction for Plaintiff's classes.

71.    Thus, Plaintiff provided the District with different options to account for those limited students, and reminded Mr. Brennan that CARES Act funds could

be used specifically to assist with the situation and his temporary accommodation, if necessary.

72.    Instead of considering Plaintiff's request, the District  instead seemed to focus on every possible situation expect for telework, including moving Plaintiff from teaching his usual 11th and 12th grade classes to teaching 7th grade, where he could allegedly be closer to an exit door.

73.    The District knew this proposed class change was not realistic with just days until the start of classes.

74.    Plaintiff had no experience with the 7th grade curriculum and instruction, and the teacher who would replace Plaintiff had no experience with any of the four (4) classes taught by Plaintiff and, in fact, was not certified to do so.

75.    Not only would this be detrimental to the students and teachers given the proximity to the beginning of the school year, it would also likely violate the terms of the underlying Collective Bargaining Agreement.

76.    Moreover, the administration knew that this move would cause other staff members to harbor a personal animus against Plaintiff since they would hold him responsible for their late classroom re-assignments.

77.    In terms of location, Plaintiff already taught in a classroom near the referenced exit door.

78.    On top of that, the 7th grade classes were significantly larger than Plaintiff's assigned course load.

79.    Specifically, Plaintiff would go from teaching a total of 71 kids throughout the day to 126 kids, thereby increasing his exposure to the virus.

80.    For these reasons, it is believed and therefore averred that this alternative accommodation proposed by the District was punitive, hostile and/or retaliatory in nature, and nothing more than a disingenuous and/or pre-textual effort to appear accommodating.

81.    Thus, the meeting ended with a renewed and reaffirmed request by Plaintiff to continue with telework as a reasonable accommodation under the ADA.

82.    On or about August 31, 2020, Plaintiff received a letter from Mr. Brennan denying his request for telework accommodations, and further outlining a series of other general accommodations offered by the District.

83.    Although Plaintiff's undersigned counsel informed the District's Solicitor that the alternative accommodations offered by the District were unacceptable, Mr. Brennan inaccurately communicated to Plaintiff that the District did not receive a timely response to its denial letter.

84.    In denying Plaintiff's request to continue teleworking, Mr. Brennan stated that it was his opinion that Plaintiff "would not be an effective teacher by teaching [his] students from home".

85.    This statement is entirely without merit.   As referenced above, Plaintiff and all of his colleagues effectively taught from home for the remainder of the 2019-2020 school year.

86.    More importantly, Plaintiff taught Advanced Placement ("AP") courses, and his students' scores improved while teaching from home.

87.    Mr. Brennan further stated that "working from home is not a reasonable accommodation since classroom management is an essential function of a teacher".

88.    This statement also lacks merit.   As alluded to above, Plaintiff provided the District with other viable options to deal with this temporary situation, and reminded Mr. Brennan that Federal CARES Act money was available to offset any additional costs, if there were any.

89.    This included moving the limited number of students who choose in-person instruction to other classrooms or a larger study area, such as the cafeteria or auditorium or library, where they could be monitored by an existing staff member.

90.    In fact, although the District indicated that this would be an undue hardship, the District has since taken this action on multiple occasions throughout the current school year, which includes having teachers monitor Plaintiff's

classroom itself and/or moving his students to the library, just as Plaintiff quite literally requested and suggested as part of his accommodation.

91.    These actions taken by the District clearly demonstrate that the District is fully capable of implementing the temporary accommodation requested by the Plaintiff without substantial burden or hardship, but it simply refuses to do so.

92.    On this point, it also bears mentioning that the District seems to treat the health and safety of its students differently than the health and safety of its staff.

93.    While students were given the option of all virtual instruction or hybrid instruction because of the pandemic, the teaching staff was not given any such options.

94.    Teachers were required to be in the building, even if they had an underlying ADA recognized disability with increased risk of harm from exposure to COVID 19 such as the Plaintiff, as recognized by the CDC and/or EEOC.

95.    In short, students were given reasonable accommodations, but disabled staff were not.

96.    And if you were a student athlete you were given even more protections.

97.    To this end, Mr. Brennan regularly encouraged and instructed student athletes to stay home from school to avoid exposure to the virus so as not to impact or otherwise jeopardize their respective sport seasons.

98.    Mr. Brennan even at one point held a virtual meeting with boys and girls basketball players and their families, at which time he encouraged them all to opt-into the all virtual instruction option rather than returning to hybrid.

99.    The stated reason was, again, to reduce the risk of contracting COVID-19 and interrupting their sports season.

100.   Sports were more of a priority for the District than education and disabled educators who were at high risk of severe complications from exposure to COVID-19.

101.   As a result of the District's failure and/or refusal to provide the requested accommodation, Plaintiff met virtually with his principals on September 3, 2020 to let them know that he would be taking sick time and/or approved leave under the FFCRA.

102.   Although he would use sick leave, Plaintiff offered to still teach from home during that time.

103.   However, by way of email on or about September 8, 2020, Mr. Brennan directed Plaintiff not to teach from home while taking sick days.

104.   When attempting to address this directive with his building principal, Plaintiff was told that Mr. Brennan directed the principals not to speak with Plaintiff about the matter, and that all communications with Plaintiff needed to go through Mr. Brennan.

105.   During the course of these events, another teacher who requested telework accommodations under the ADA was verbally offered the option to teach exclusively virtual.

106.   Plaintiff, of course, was not offered a similar opportunity.

107.    In addition to his teaching duties, Plaintiff also served as the ESports coach for the District, duties he also performed remotely since the shutdown caused by the pandemic to the praise of Mr. Brennan.

108.   However, it did not take long for Mr. Brennan to continue with his hostile actions and campaign of retaliation against Plaintiff by turning his sights to Plaintiff's ESports position.

109.   On or about September 21, 2020, Mr. Brennan sent a directive to all faculty and staff stating that anybody who misses more than three (3) consecutive days should not perform duties related to supplemental positions.

110.   This was a new, non-existing policy directive issued by the District.

111.   Such policy was never documented and/or never communicated to any District employees.

112.   In fact, there were past and present instances where this alleged policy was not implemented and/or enforced by the District as it related to employees who held supplemental positions.

113.   Thus, it is believed and therefore averred that this new alleged policy was created to target and/or retaliate against Plaintiff for taking leave in response to the District's refusal to accommodate Plaintiff's request to teach remotely.

114.   As such, Plaintiff immediately contacted both his union president and attorney to alert them to the District's hostile and/or retaliatory actions.

115.   Nevertheless, on or about October 2, 2020, Plaintiff formally received notice from Mr. Brennan to stop coaching until a meeting could take place to discuss this newly enacted policy.

116.   On a phone call with union leadership on or around October 4, 2020, Plaintiff was told that Mr. Brennan's desire to meet became hostile after a series of previous email exchanges between the parties.

117.   On or about October 6, 2020, Plaintiff switched from sick leave to leave under the FFCRA.

118.   As of this time, Plaintiff also became fearful that he was being forced out of his supplemental ESports coaching position for no other reason than requesting and accommodation under the ADA and taking leave when that accommodation was denied.

119.    In an email exchange over the Columbus Day weekend, Mr. Brennan began accusing Plaintiff of scheduling matches and naming captains without District approval, and demanded that Plaintiff show up in-person to coach that Monday.

120.    Contrary to Mr. Brennan's erroneous assertions, Plaintiff did not schedule any matches or name any captains, and Mr. Brennan provided no evidence to back up his accusations.

121.    On or about October 13, 2020, Plaintiff further learned from union leadership that Mr. Brennan was "gathering evidence" for a telephone meeting the following day, October 14, 2020.

122.    The hostile and/or retaliatory nature of Mr. Brennan's actions continued at that October 14, 2020 ESports meeting.

123.    Instead of providing Plaintiff with the proper written notices required under the law prior to this meeting, the District led Plaintiff to believe that the purpose of the meeting was simply to discuss and resolve issues related to the continued coaching of ESports remotely.

124.    As a result, Plaintiff came to the meeting only prepared to present proposals to make it work, particularly because not all players would be able to attend in person.

125.   However, once the tone of the meeting changed and it became apparent that the meeting was hostile and disciplinary in nature, Plaintiff asked for an explanation of his rights, which the District did not provide.

126.   The meeting continued anyway, and Mr. Brennan stated that Plaintiff did not have permission to record the meeting.

127.   Plaintiff's Principal also attended the meeting, even though he was not previously identified by Mr. Brennan as a participant.

128.   Mr. Brennan also chastised Plaintiff for copying his attorney on email communications related to the meeting, and accused him of being untruthful and unethical without any basis whatsoever, impugning his character, integrity and reputation.

129.   He also insisted repeatedly that Plaintiff was questioning his authority, and told Plaintiff that any free speech rights he thought he had didn't apply to him.

130.   At the conclusion of the meeting, Mr. Brennan directed Plaintiff not to talk to parents or students about ESports.

131.   On or about October 15, 2020, less than 24 hours after the aforesaid meeting, Plaintiff was essentially removed as the ESports coach when the District opened and posted the position for the 2020-2021 school year.

132.   Plaintiff was removed from the position despite the fact that he at all times properly performed his duties, including holding tryouts, conducting regular practices and successfully securing grant funding for the program.

133.   Plaintiff coached remotely since the beginning of the shutdown caused by the pandemic.

134.   In fact, the District's ESports team was the only operating athletic program in all of Northeastern Pennsylvania, for which Plaintiff also received previous praise from Mr. Brennan.

135.   Although released on October 15, 2020, the new posting for the ESports position was actually dated October 14, 2020, indicating that Mr. Brennan made his determination to terminate Plaintiff even before the aforesaid meeting took place.

136.   Moreover, if the positon was truly reopened, such postings for Fall positions are universally posted by the District in or before August of the respective year, not in October as was the case here.

137.   Having been removed from the ESports position after performing his duties, Plaintiff requested payment for same from the District on or about October 15, 2020.

138.   The District, however, has at all times failed and/or refused to compensate Plaintiff for his services despite repeated demands for same.

139.    Also, although Plaintiff reapplied for the ESports job, Plaintiff never heard back from the District.

140.    The hostile actions taken by Mr. Brennan against the Plaintiff were clearly a continued form of retaliation against Plaintiff, but did not end there.

141.    On or about October 22, 2020, Plaintiff filed administrative charges against the District with the EEOC and PHRC.

142.    Not surprisingly, after its later receipt of the administrative charges, the District -- through Mr. Brennan -- sent a letter of reprimand to Plaintiff on or about December 1, 2020.

143.    Although the letter of reprimand was sent on December 1, 2020, it related to conduct stemming from the aforesaid meeting that took place all the way back on October 14, 2020.

144.    The timing of the letter, however, was no coincidence.

145.    If Mr. Brennan were inclined to send such a letter of reprimand to Plaintiff, he could have easily done so immediately after the October 14th meeting.

146.    He did not.

147.    Instead, Mr. Brennan did so in early December only after receiving the EEOC and/or PHRC charges filed by Plaintiff.

148.   This is just further evidence of the hostile, retaliatory and/or discriminatory conduct by the District in response to Plaintiff's accommodation request and subsequent leave.

149.   In the meantime, the District designated November 3 and November 10, 2020 as "FLEX" days, during which no instruction would occur.

150.   Said "FLEX" days were for teachers to engage in, *inter alia*, parent contact, planning, and grading.

151.   Although Plaintiff could easily have worked from home during these "FLEX" days without issue, Plaintiff was not afforded the opportunity.

152.   While the District denied Plaintiff's requested accommodation to teach from home during the pandemic, other non-disabled teachers and staff were granted such temporary accommodations.

153.   For instance, in November of 2020, Plaintiff learned that a teacher who was in quarantine due to exposure to the virus was allowed to teach from home.

154.   By allowing non-disabled teachers to teach from home on a temporary basis and not providing the same accommodation to disabled staff such as Plaintiff, the District has engaged in clear acts of discrimination in violation of the ADA and the PHRA.

155.   On or about November 19, 2020, Mr. Brennan announced that the District we would be going full virtual instruction until December 1, 2020 due to COVID-19 outbreaks in certain District buildings.

156.   However, the District still mandated that all teachers be physically present in their buildings, thereby forcing Plaintiff to remain on leave, even though he could have easily taught from home with no students in the classroom.

157.   Although Mr. Brennan emailed Plaintiff on November 20, 2020 to inquire if Plaintiff would be coming into the building to teach virtually, Mr. Brennan, once again, did not offer Plaintiff the opportunity to teach from home, even though doing so would pose no hardship to the District.

158.   Just two (2) days later on November 22, 2020, Mr. Brennan circulated another email to the faculty and staff at Riverside Elementary West to let them know that teachers can choose to teach from home due to two (2) Covid-19 positive tests.

159.   Yet again, this same opportunity to teach from home has never been afforded to Plaintiff, despite him being at increased risk due to his diabetic condition, and despite the presence of positive COVID-19 cases in the High School where he taught.

160.   Later that same day on November 22, 2020, Mr. Brennan circulated yet another email to indicate that full virtual instruction would be extended in the

District until December 7, 2020 due to the onset of these new positive COVID-19 cases.

161.   Thus, on or about November 23, 2020, Plaintiff emailed Mr. Brennan and stated as follows: "I would be more than happy to teach if I were granted the reasonable accommodation to teach from home, as has been done for faculty at Riverside Elementary West."

162.   While Mr. Brennan thereafter afforded District teachers the ability to teach from home, his mandate was strictly limited to a period of two (2) days during that week only.

163.   Again, by selectively allowing non-disabled teachers to teach from home on a temporary basis and not providing the same accommodation to disabled staff such as Plaintiff, the District has engaged in clear acts of discrimination in violation of the ADA and the PHRA.

164.   Also on or about November 23, 2020, parent-teacher conferences were conducted by the District, which teachers were allowed to do from home.

165.   Plaintiff, again, was not afforded the same opportunity.

166.   On or about November 24, 2020, Plaintiff taught remotely for the allotted two (2) day period.

167.   On that same day, Mr. Brennan announced that the District would no longer do contact tracing, and that the District will no longer send out notifications about positive COVID-19 cases.

168.   On November 26, 2020, Thanksgiving Day, Mr. Brennan finally announced that the District would allow teachers to teach from home until the return to hybrid instruction on December 7, 2020.

169.   Because of the continued pandemic surge and virus outbreak, the District took action on December 1, 2020 to again extend virtual instruction and at-home teaching to January 4, 2021.

170.   Again, on that same day, December 1, 2020, Mr. Brennan also emailed Plaintiff the letter of reprimand as outlined more fully above.

171.   In addition to the issues enumerated above, that letter was littered with falsehoods, threats and/or assaults on Plaintiff's ethics, reputation and integrity.

172.   Although the letter states that it is not a reprimand, it quite clearly reads like one and was placed in Plaintiff's personnel file.

173.   If it were not a letter of reprimand, it would not have been placed into said personnel file.

174.   Due to the false and misleading nature of the letter issued by Mr. Brennan, Plaintiff was forced to respond with an appropriate letter from his legal counsel dated December 4, 2020.

175. That response was issued to protect Plaintiff's integrity and reputation and, more importantly, to place of record a more reliable and true picture of what exactly happened.

176. While a request was made to put a copy of that responsive letter into Plaintiff's personnel file, Plaintiff is not aware if that was done by the District.

177. Thereafter, the hostile work environment and retaliation against Plaintiff continued.

178. The very next Monday, December 7, 2020, Plaintiff's principal made an unannounced appearance to conduct an observation of Plaintiff's virtual instruction.

179. Plaintiff continued to be the focus of Mr. Brennan's ire and contempt.

180. In-person instruction resumed on or about January 5, 2021.

181. On or about January 11, 2021, Plaintiff learned that Mr. Brennan was, once again, allowing teachers who were in quarantine due to COVID-19 exposure to teach from home.

182. Of significant relevance to this action, the administrative plan for those at home teachers was to have other teachers cover their classes, for substitutes to cover classes, and/or for students to be moved to centralized areas in the building.

183.   Amazingly, this is precisely the same accommodation requested by Plaintiff, but denied by the District.

184.   And on or about January 15, 2021, students from Plaintiff's classes were moved to the library for instruction which, yet again, was the same accommodation the District denied because of an alleged undue hardship.

185.   This is yet further selective action by the District to allow non-disabled teachers to teach from home on a temporary basis, while at the same time not providing the same accommodations to disabled staff such as Plaintiff, all clear acts of discrimination in violation of the of the ADA and the PHRA.

186.   Plaintiff also served as the Scholastic Coach for the District.

187.   At the end of February, 2021, Plaintiff learned that one of the team's competitions would be held virtually.

188.   After sending an email inquiry about this competition on or about February 26, 2021, Plaintiff received a reply email on or about March 3, 2021 advising him that he could not proceed at that time.

189.   This began yet another chain of events where Mr. Brennan engaged in hostile and retaliatory actions against Plaintiff that now focused on removing him as the Scholastic Coach.

190.   On or about April 1, 2021, Plaintiff informed the tournament operator from WVIA that he was not sure if the District would be participating in the event during his leave.

191.   Thereafter, however, Plaintiff became eligible to be vaccinated and, therefore, planned to be back in his building on April 19, 2021.

192.   As such, on or about April 8, 2021, Plaintiff informed the tournament operator that he would, in fact, be able to participate since he planned to return to the building on April 19th.

193.   On that same day, Plaintiff also informed his new principal that he would be returning on the 19th.

194.   However, to his shock and surprise, Plaintiff received a text later that day from a colleague indicating that she would be filling in for Plaintiff as the new Scholastic Coach because Mr. Brennan told her to apply for the position.

195.   This job was not posted, and no one from the District ever informed Plaintiff that he was removed as the coach.

196.   Upon learning of this, Plaintiff's hand-selected replacement declined the position.

197.   As such, Plaintiff then put in for a "School business" day on April 30, 2021 so that he could take the team to the competition scheduled for that day.

198.   On or about April 11, 2021, Mr. Brennan notified Plaintiff that he would not be involved in the scheduled competition as he appointed yet another staff member to lead the team, despite the fact that the job was neither opened nor posted for new applicants.

199.   In doing so, Mr. Brennan criticized Plaintiff for putting in for a business day and thinking he was still the coach of the team.

200.   At no point, however, did Mr. Brennan ever inform Plaintiff that he was removed or terminated as the coach.

201.   And in his four (4) years of serving as the Scholastic Coach, Plaintiff reminded Mr. Brennan that he never had to reapply for the job in any of those previous 4 years of service, during which time he took his students to the National Championships.

202.   Thus, the posting of this positon was not "routine" as Mr. Brennan erroneously suggested.

203.   On or about April 12, 2021, Mr. Brennan emailed Plaintiff and told him, inaccurately, that he replaced Plaintiff because it was his understanding that Plaintiff could not participate in the competition.

204.   At no point, however, did Mr. Brennan attempt to verify this information with Plaintiff, which he could have easily done.

205.   In that same email communication, which included Plaintiff's new principal as a recipient, Mr. Brennan referenced Plaintiff's endocrinologist by name.

206.   Not only was this reference unnecessary and irrelevant to the issue at hand, but it also violated Plaintiff's rights under the Health Insurance Portability and Accountability Act ("HIPAA").

207.   Even though he already appointed two (2) separate staff members to the position, both of whom ultimately declined, Mr. Brennan further indicated that the job would be posted after the board meeting scheduled for that same evening, and that Plaintiff could re-apply for the position.

208.   Plaintiff re-applied for the positon on or about April 13, 2021.

209.   Because the competition was scheduled for April 30, 2021, Plaintiff contacted Mr. Brennan to alert him to the fact that a coach needed to be appointed by that date, and that the next Board meeting where said coach could or would be appointed was scheduled to take place after that date.

210.   Out of nowhere, Mr. Brennan responded by telling Plaintiff that he was not discriminating against him, and further claimed: "Just because you falsely state something doesn't make it factual."

211.   This was completely unresponsive to the content and/or purpose of Plaintiff's email, which was nothing more than a simple "FYI" regarding the timing of the match.

212.   Also out of nowhere, Mr. Brennan indicated that he was conducting an investigation into the two (2) staff members he previously appointed to the position who quit so suddenly, clearly insinuating that Plaintiff was the target of his investigation.

213.   Due to the time sensitive nature of matter, Mr. Brennan really had no choice but to rehire Plaintiff for the position, albeit at a reduced salary, which was yet another hostile, discriminatory and/or retaliatory action.

214.    In the meantime, the District further discriminated against Plaintiff by allowing yet another non-disabled staff member to work from home as an accommodation for a health related issue.

215.   More specifically, on or about March 31, 2021, Plaintiff learned that the principal of his school would be out recovering from a surgical procedure for a 6 to 10 week period.

216.   During that timeframe, the District allowed that building principal to perform his duties and responsibilities while working from home.

217.   The District also allowed that principal to chaperone the prom at a later date, even though it allegedly violated the new policy enacted by Mr. Brennan

that prohibited staff from performing supplemental duties if they were our for three (3) consecutive days.

218.   After all, this was the same policy that Mr. Brennan used to remove Plaintiff from his ESports coaching position as detailed more fully above.

219.   In any event, the same reasonable accommodations that were granted to the building principal were not afforded to Plaintiff who suffered from an ADA recognized disability and, who because of that disability, put him at an increased risk of harm from exposure to COVID-19 based on well-established CDC and EEOC guidelines.

220.   These actions by the District reveal the hostile and discriminatory nature of the District's actions against Plaintiff.

221.   In denying Plaintiff's request to work from home, Mr. Brennan stated that Plaintiff would not be an effective teacher working from home, and that classroom management was an essential function of the job.

222.   Apparently this same reasoning does not apply to Plaintiff's boss who is in charge of the entire building and its entire staff.

223.   Nevertheless, Plaintiff continues to be the target and subject of a hostile work environment by the District.

224.   On or about May 5, 2021, Plaintiff received notification that a District secretary asked the District's Director of Technology if Plaintiff had permission to use the ESports computers for the Scholastic event on April 30, 2021.

225.   Coincidentally enough, that secretary just happened to be the daughter of a District School Board member.

226.   And it is abundantly clear that the use of District equipment is not part of her job description as a District secretary, so there would be no reason for her to make such an inquiry.

227.   Defendant has not accommodated Plaintiff's Diabetes.

228.   However, as set forth more fully above, Defendant has accommodated several other non-disabled staff members by granting them the accommodation requested by, but denied to, Plaintiff.

229.   As a result of the discrimination and series of hostile and retaliatory actions taken by the District as outlined more fully above, Plaintiff has experienced continued bouts of sleeplessness, stress and anxiety, resulting in high blood pressure levels.

230.   In fact, Plaintiff's symptoms became so severe that he was forced to see his primary care physician, who prescribed medication to treat his worsening condition.

231.   As a result of the discrimination and series of hostile and retaliatory actions taken by the District as outlined more fully above, Plaintiff has suffered, or will suffer, lost wages, earnings and/or benefits.

**COUNT I**
**PLAINTIFF V. DEFENDANT**
**(Violations of the ADA)**

232.   The preceding paragraphs of this Complaint are incorporated herein by reference as if set forth fully herein.

233.   Defendant's acts and/or omissions as set forth more fully above constitute unlawful discrimination against Plaintiff on the basis of his disability in violation of the ADA.

234.   After successfully performing telework for months due to the government shutdown caused by the pandemic, Defendant denied Plaintiff's request to continue teleworking on a temporary basis until the shutdown was lifted or it was otherwise safe for Plaintiff to return.

235.   Defendant's failure and/or refusal to provide Plaintiff with a reasonable and temporary accommodation under the circumstances caused by the pandemic as set forth more fully above constitutes unlawful discrimination against Plaintiff on the basis of his disability in violation of the ADA.

236.   As referenced above, temporary telework is certainly contemplated and recommended as a viable accommodation by the CDC and/or EEOC for

individuals such as Plaintiff who suffer from Diabetes that subjects him or her to a heightened risk of death or serious illness from exposure to COVID-19.

237.   Defendant also violated the ADA by failing and/or refusing to make a good faith effort to accommodate Plaintiff through the interactive process.

238.   As set forth more fully above, Plaintiff did not conduct an individualized assessment of Plaintiff's accommodation request by properly focusing on, *inter alia*, Plaintiff's condition, past history of telework, and the existing facts and circumstances caused by the pandemic.

239.   Instead, Defendant made clear that it expected all teachers to return to in-person instruction no matter what their individual circumstances.

240.   As evidence of this general policy, Mr. Brennan made the blanket statement that he could not accommodate Plaintiff because if he did it for one, he would have to do it for all.

241.   And although Defendant informed Plaintiff that the District would be implementing increased safety and cleaning protocols at the start of the school year, those so-called accommodations were nothing more than general workplace safety rules that applied to everyone across the board rather than individualized accommodations to address Plaintiff's disability.

242.   Defendant did not take the necessary actions to ensure that it had all of the necessary information about Plaintiff and his condition to seriously consider Plaintiff's temporary accommodation request.

243.   Defendant's acts and/or omissions as set forth more fully above were also retaliatory and created a hostile work environment on the basis of Plaintiff's disability, subsequent leave and/or filing of administrative charges/filings, and Defendant failed to eliminate that hostile work environment, in violation of the ADA.

244.   As detailed more full above, Plaintiff engaged in protected activity and suffered contemporaneous or subsequent adverse action by the District as a result of engaging in said protected activity.

245.   Defendant's discriminatory acts and/or omissions have  caused, continue to cause and will cause Plaintiff substantial damages in the form of lost past or future wages, the loss of employment benefits and other pecuniary losses, as well as mental anguish and humiliation, emotional distress and related physical symptoms, the loss of enjoyment of life and other non-pecuniary losses.

246.   Defendant's acts of discrimination were at all times intentional, willful, malicious and/or taken with reckless indifference to Plaintiff's protected rights, and Defendant acted with knowledge that its actions may give rise to a violation of the law.

WHEREFORE, Plaintiff demands judgment on this Count in his favor and against Defendant, together with an award of back/front pay, compensatory damages and punitive damages as permitted by law in an amount to be determined at trial, plus statutory interest, costs of suit and/or reasonable attorneys' fees as permitted by law, and such other and further relief to which this Court deems just and proper.

**COUNT II**
**PLAINTIFF V. DEFENDANT**
**(Violations of PHRA)**

247. The preceding paragraphs of this Complaint are incorporated herein by reference as if set forth fully herein.

248. Defendant's acts and/or omissions as set forth more fully above constitute unlawful discrimination against Plaintiff on the basis of his disability in violation of the PHRA.

249. After successfully performing telework for months due to the government shutdown caused by the pandemic, Defendant denied Plaintiff's request to continue teleworking on a temporary basis until the shutdown was lifted or it was otherwise safe for Plaintiff to return.

250. Defendant's failure and/or refusal to provide Plaintiff with a reasonable and temporary accommodation under the circumstances caused by the

pandemic as set forth more fully above constitutes unlawful discrimination against Plaintiff on the basis of his disability in violation of the PHRA.

251.  As referenced above, temporary telework is certainly contemplated and recommended as a viable accommodation by the CDC and/or EEOC for individuals such as Plaintiff who suffer from Diabetes that subjects him or her to a heightened risk of death or serious illness from exposure to COVID-19.

252.  Defendant's acts and/or omissions as set forth more fully above were also retaliatory and created a hostile work environment on the basis of Plaintiff's disability, subsequent leave and/or filing of administrative charges/filings, and Defendant failed to eliminate that hostile work environment, in violation of the PHRA.

253.  As detailed more fully above, Plaintiff engaged in protected activity and suffered contemporaneous or subsequent adverse action by the District as a result of engaging in said protected activity.

254.  Defendant's discriminatory acts and/or omissions have  caused, continue to cause and will cause Plaintiff substantial damages in the form of lost past or future wages, the loss of employment benefits and other pecuniary losses, as well as mental anguish and humiliation, emotional distress and related physical symptoms, the loss of enjoyment of life and other non-pecuniary losses.

WHEREFORE, Plaintiff demands judgment on this Count in his favor and against Defendant, together with an award of back/front pay and compensatory damages as permitted by law in an amount to be determined at trial, plus statutory interest, costs of suit and/or reasonable attorneys' fees as permitted by law, and such other and further relief to which this Court deems just and proper.

Respectfully submitted,

By: _/s/ Frank J. Tunis, Jr._____
    Frank J. Tunis, Jr.
    PA Bar I.D. No. 84264
    TUNIS LAW
    R347 Main St.
    Dickson City, PA 18519
    (570) 954-9363
    (570) 341-7558 – fax

Dated:  May 20, 2021        gunnytun@yahoo.com